IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

TERESA JACQUEZ PROVENCIO,

         Plaintiff,

vs.                              No. CIV 09-980 LFG

MICHAEL ASTRUE, Commissioner
of the Social Security Administration,

         Defendant.

## MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION TO REVERSE AND REMAND AND DISMISSING ACTION WITH PREJUDICE

Plaintiff Teresa Jacquez Provencio ("Provencio") invokes this Court's jurisdiction under 42 U.S.C. § 405, seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner determined that Provencio was not eligible for disability insurance benefits ("DIB") nor for supplemental security income benefits ("SSI"). Provencio moves this Court for an order reversing the Commissioner's final decision and remanding for a rehearing.

### Background

Provencio was born on February 21, 1961 and was 47 years old at the time of the administrative hearing in November 2008. [Tr. 150]. She completed a G.E.D. in 1991. [Tr. 154]. She previously worked as a waitress in a restaurant, kitchen supervisor at a gospel mission, and a certified nurse assistant for the State of New Mexico. [Tr. 150-151, 164-172, 213].

Provencio claims disability based on chronic lower back pain, and mental impairments including major depression, post-traumatic stress disorder ("PTSD") and bipolar disorder. [Tr. 10, 28-45, 149, 954]. She alleges an onset date of November 9, 2005. [Tr. 22, 149]. Her applications for DIB and SSI were denied at the initial and reconsideration stages, and she sought timely review by an Administrative Law Judge ("ALJ"). [Tr. 61-75, 78]. An administrative hearing was held

before the ALJ on November 5, 2008. [Tr. 16].

In a written decision dated April 10, 2009, ALJ Frederick Upshall, Jr. found that Provencio was not disabled within the meaning of the Social Security Act and denied her applications for benefits. [Tr. 5-15].  Provencio challenged this determination to the Appeals Council which denied her request for review on September 18, 2009. [Tr. 1-4].  This appeal followed.

## Standards for Determining Disability

In determining disability, the Commissioner applies a five-step sequential evaluation process.[1]  The burden rests on the claimant throughout the first four steps of this process to prove disability, and if the claimant is successful in sustaining her burden at each step, the burden then shifts to the Commissioner at step five.[2]  If at any step in the process, the Commissioner determines

---

[1]20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

[2]The parties disagree as to the meaning of the phrase "the burden shifts" at step five.  The Court applies the following interpretation set forth by the Commissioner in clarifying the regulations:

> Although you generally bear the burden of proving disability throughout the sequential evaluation process, there is a limited shift in the burden of proof to us "only if the sequential evaluation process proceeds to the fifth step * * *." Bowen v. Yuckert, [487 U.S. 137 (1987)]. When the process proceeds to the fifth step, this means that you have demonstrated the existence of a severe impairment(s) resulting in an RFC that prevents the performance of past relevant work. When we decide that you are not disabled at step 5, this means that we have determined that there is other work you can do. To make this finding, we must provide evidence that demonstrates that jobs exist in significant numbers in the national economy that you can do, given your RFC, age, education, and work experience. In legal terms, this is a burden of production of evidence.
>
> This burden shifts to us because, once you establish that you are unable to do any past relevant work, it would be unreasonable to require you to produce vocational evidence showing that there are no jobs in the national economy that you can perform, given your RFC. However, as stated by the Supreme Court, "It is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so." Bowen v. Yuckert, id. Thus, the only burden shift that occurs at step 5 is that we are required to prove that there is other work that you can do, given your RFC, age, education, and work experience. That shift does not place on us the burden of proving RFC.
>
> When the burden of production of evidence shifts to us at step 5, our role is to obtain evidence to assist in impartially determining whether there is a significant

that the claimant is or is not disabled, the evaluation ends.[3]

Briefly, the steps are: at step one, claimant must prove she is not currently engaged in substantial gainful activity;[4] at step two, the claimant must prove her impairment is "severe" in that it "significantly limits [her] physical or mental ability to do basic work activities . . . .;"[5] at step three, the Commissioner must conclude the claimant is disabled if she proves that these impairments meet or are medically equivalent to one of the impairments listed in the Listing of Impairments at 20 C.F.R. Pt. 404, Subpt. P, App. 1(the "Listings")[6]; and, at step four, the claimant bears the burden of proving she is incapable of meeting the physical and mental demands of her past relevant work.[7]

If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to show, at step five, that considering claimant's residual functional capacity ("RFC"),[8] age, education and past work experience, she is capable of performing other work.[9] If the Commissioner proves other work exists which the claimant can perform, the claimant is given the

---

number of jobs in the national economy you can do. Thus, we have a burden of proof even though our primary interest in the outcome of the claim is that it be decided correctly. As required by the Act, the ultimate burden of persuasion to prove disability, however, remains with you.

[3]20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[4]20 C.F.R. §§ 404.1520(b), 416.920(b).

[5]20 C.F.R. §§ 404.1520(c), 416.920(c).

[6]20 C.F.R. §§ 404.1520(d), 416.920(d). If a claimant's impairment meets certain criteria, that means his impairments are "severe enough to prevent [her] from doing any gainful activity." 20 C.F.R. §§ 404.1525(a), 416.925(a).

[7]20 C.F.R. §§ 404.1520(e),(f) 416.920(e),(f).

[8]The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy. Those categories are: sedentary, light, medium, heavy and very heavy. 20 C.F.R. §§ 404.1567, 416.967.

[9]20 C.F.R. §§ 404.1520(g), 416.920(g).

chance to prove she cannot, in fact, perform that work.[10]   In the case at bar, the ALJ made the dispositive determination of non-disability at step five of the sequential evaluation.

Provencio contends that the final administrative decision is not supported by substantial evidence, that the Commissioner did not carry the burden of proof, and that the Commissioner did not apply the correct legal standards.

### Standard of Review and Allegations of Error

On appeal, the Court's review of the Commissioner's determination is limited.  Hamilton v. Sec'y of Health & Human Servs., 961 F.2d 1495, 1497 (10th Cir. 1992).  The Court's function is to consider whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards.  Glenn v. Shalala, 21 F.3d 983 (10th Cir. 1994).  To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance.  Trimiar v. Sullivan, 966 F.2d 1326, 1329 (10th Cir. 1992).

In Clifton v. Chater, 79 F.3d 1007, 1009-10 (10th Cir. 1996), the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence.  Rather, in addition to discussing the evidence supporting his decision, the ALJ must also discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.  (citations omitted).

If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.  The Court can neither re-weigh the evidence nor substitute its judgment for that of the Commissioner.  Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).

In this case, the ALJ found that Provencio is capable of the full range of unskilled, sedentary work and that, considering her age, education and work experience, a finding of "not disabled" is directed by the Medical-Vocational Guidelines ("the Grids") (20 C.F.R. Pt. 404, Subpt. P, App. 2),

---

[10]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

Rule 201.22.

Provencio claims that the ALJ erred in the following ways: (1) using the Grids conclusively rather than obtaining evidence from a vocational expert ("VE"), in light of record evidence of nonexertional impairments including limitations in concentration, persistence and pace, and limitations to only "occasional" postural activities; (2) mishandling the treating physician opinion of psychiatrist Dr. Alan Berkowitz; (3) making a credibility finding that is not supported by the evidence; (4) failing to consider that noncompliance with prescribed medical treatment is often a symptom of mental impairment rather than an unjustified refusal to comply; and (5) failing to perform a proper substance use analysis. She further contends that, on remand, the ALJ should take into account the fact that Provencio's subsequent applications for disability benefits were approved.

The Court rejects each of these assertions of error and denies the Motion to Reverse and Remand.

## **Discussion**

### A.  Conclusive Application of the Grids

In applying the Grids, the ALJ must make findings of fact as to age, education, work experience, and residual functional capacity.  20 C.F.R. §§ 404.1545, 404.1563-1565, 416.945, 416.963-965.  The Grids may be applied conclusively when a claimant's residual functional capacity, age, work experience and education precisely match a grid category.  20 C.F.R. Part 404, Subpt. P, App. 2, § 200.00(e)(2); Gossett v. Bowen, 862 F.2d 802, 806 (10th Cir. 1988).  However, when a claimant presents evidence of nonexertional impairments such as pain or mental limitations, the Grids often are not conclusive but instead are used merely to provide a framework for the disability determination.  Social Security Ruling ("SSR") 96-9p, 1996 WL 374185, at *4.

The Grids are divided into five residual functional capacity categories.  Each category measures the exertional level required to perform work within the category.  Exertional levels refer to the claimant's ability to walk, stand, lift, carry, push, pull and reach.  Id., at **6-7.  These findings are factored into the grid to produce a factual conclusion of disabled or not disabled.  20 C.F.R. §§

404.1569, 416.969.

When nonexertional limitations are present, the ALJ must make findings as to how much a claimant's work ability is further diminished by the nonexertional limitations. If the claimant's nonexertional limitations are significant enough to reduce his or her work capacity further, the ALJ may not rely solely on the Grids but instead must give full consideration to all relevant facts, including vocational expert testimony, if necessary, in determining whether the claimant is disabled. Channel v. Heckler, 747 F.2d 577, 582-83 (10th Cir. 1984).

On the other hand, if the nonexertional limitations are not so significant that they affect the claimant's ability to do the full range of work in a given category, the Grids may be applied conclusively. Callaway v. Apfel, No. 98-6388, 1999 WL 448820, at *1 (10th Cir. July 2, 1999) ("While a nonexertional limitation may preclude use of the grids, the grids can be used if the impact of those impairments does not significantly reduce the underlying job base," *citing* Evans v. Chater, 55 F.3d 530, 532 (10th Cir.1995) for the proposition that the "ability to perform 'substantial majority' of work in residual functional capacity assessment suffices for purposes of grids").

In this case, the ALJ found that Provencio has the RFC to perform a full range of sedentary work. If this finding is correct and supported by substantial evidence, there was no error in applying the Grids conclusively. Provencio contends, however, that the ALJ was required to seek the opinion of a VE, rather than applying the Grids conclusively, because she has nonexertional impairments that should have been included in the ALJ's assessment of her RFC.

### 1. Mental limitations

One of these nonexertional impairments is Provencio's difficulty in concentration, persistence or pace. The ALJ found that she has moderate difficulties in these areas [Tr. 11, 14]. As Provencio notes, the record includes references to crying spells, irritability, mood swings, isolation, motivational difficulties, hopelessness, anxiety, sleep problems including nightmares, intrusive thoughts and flashbacks to traumatic sexual abuse incidents. [*See, e.g.*, Tr. 201, 232-234, 330-343, 369, 371-372, 374-375, 385, 400-402, 405-410, 412-413, 418-423, 429, 624, 645, 647,

661, 679, 688, 699, 701, 923].

All of these symptoms support the ALJ's finding that Provencio suffers limitations in the functional areas of concentration, persistence and pace.  In addition, in a Field Office report dated October 26, 2006 (around the time that Provencio first submitted her application for benefits), the interviewer wrote that Provencio "had some problems concentrating and answering some questions / she had her case worker from Border Area Mental Health assist her." [Tr. 146].

Provencio contends that the ALJ's finding as to limitation in concentration, persistence and pace required the ALJ to elicit testimony from a VE, rather than relying exclusively on the Grids.

This issue was addressed more specifically in SSR 96-9p, which explains that a substantial loss of ability to meet any one of several basic work-related activities on a sustained basis (i.e., 8 hours a day, 5 days a week, or an equivalent work schedule) due to mental limitations will substantially erode the unskilled sedentary occupational base and justify a finding of disability.

These mental activities, which are generally required by competitive, remunerative, unskilled work, include understanding, remembering, and carrying out simple instructions; making judgments that are commensurate with the functions of unskilled work – i.e., simple work- related decisions; responding appropriately to supervision, co- workers and usual work situations; and dealing with changes in a routine work setting.  Id., at *9.  SSR 96-9p goes on to note:

> A less than substantial loss of ability to perform any of the above basic work activities *may or may not* significantly erode the unskilled sedentary occupational base. The individual's remaining capacities must be assessed and a judgment made as to their effects on the unskilled occupational base considering the other vocational factors of age, education, and work experience. When an individual has been found to have a limited ability in one or more of these basic work activities, it may be useful to consult a vocational resource.

Id. (emphasis added).

The Commissioner contends that Provencio's argument confuses the ALJ's role at steps two and three of the analysis with his duty to determine RFC and disability at steps four and five.  At steps two and three, the ALJ must determine whether the Claimant has any medically severe impairments, and whether one of these impairments or a combination thereof meets or equals any

impairment in the Listings.  The regulations require that the ALJ must apply a "special technique" in determining whether a mental impairment is severe.  20 C.F.R. §§ 404.1520a, 416.920a.

This technique includes rating the degree of functional limitation based on the extent to which an impairment interferes with the Claimant's ability to function in four broad areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence and pace; and (4) episodes of decompensation. The ratings for the first three categories are made on a five-point scale: None, mild, moderate, marked, and extreme.  20 C.F.R. §§ 404.1520a(c), 416.920a(c).

The ALJ in this case applied the requisite special technique at step two and found that Provencio experiences only mild difficulty in two areas, activities of daily living and social functioning, although she has moderate difficulties with concentration, persistence and pace.  He found no episodes of decompensation.  [Tr. 11].  He then went on to find that Provencio's mental impairments do not meet or equal any of the Listings.

Having determined that the Listings were not met, at this point in the five-step analysis the ALJ was required to make a finding as to Provencio's RFC.  In doing so, the ALJ stated:

> Although "moderate" limitations in concentration, persistence, and pace are warranted, she retains the mental focus and ability to effectively perform simple, repetitive and routine work tasks such as those inherent in unskilled types of work . . . .  Ms. Provencio has a residual functional capacity compatible with the performance of unskilled "sedentary" work.

[Tr. 14].

In light of the finding of moderate limitations in these areas, it would not have been error for the ALJ to consult a VE; however, the Court rejects Provencio's contention that the ALJ was required to do so.  The ALJ found that, in spite of Provencio's moderate limitations in concentration, persistence and pace, she retains the mental focus and ability to perform tasks inherent in unskilled work.  The record supports this finding.

"Unskilled" work is defined in the regulations as follows:

> Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. The job may or may not require considerable strength. For example,

8

> we consider jobs unskilled if the primary work duties are handling,
> feeding and offbearing (that is, placing or removing materials from
> machines which are automatic or operated by others), or machine
> tending, and a person can usually learn to do the job in 30 days, and
> little specific vocational preparation and judgment are needed.

20 C.F.R. §§ 404.1568(a), 416.968(a).

Provencio has not pointed to anything on the record which would support a finding that her depression and PTSD render her incapable of doing work "which needs little or no judgment" and involves simple duties which can be learned in a short period of time.  The records from Border Area Mental Health ("BAMH"), where Provencio received treatment for depression and other psychological problems, support the ALJ's finding that Provencio's mental condition did not substantially erode the occupational base.

Provencio first contacted BAMH in April 2006.  She was a walk-in patient, in crisis.  She reported that she was depressed and had been crying all day due to multiple stresses: loss of her job and resulting financial difficulties, death of a close relative, and problems in her relationship with her boyfriend.  She stated that she felt her world was collapsing around her, that she couldn't sleep, felt jumpy, and recently bought cocaine "just to get numb" but "the cops stopped her" and as a result she was facing a court date.   She also reported sexual abuse as a child and young adolescent.  [Tr. 330-333, 343, 418, 421-422].

After an initial assessment, Provencio began seeing a therapist for one-on-one therapy on May 19, 2006.  At the first session, the therapist explored stress management skills such as exercise, eating in a more healthy fashion and drinking more water, and calling the crisis line. [Tr. 412-413].  At her second appointment on June 6, 2006, Provencio failed to show up. [Tr. 411].  At a session on June 7, 2006, the therapist noted that Provencio was highly depressed, experienced significant levels of anxiety at night and impairments in motivation in daily tasks.  Provencio was encouraged to attend yoga classes and to start walking on a regular basis.  [Tr.  409].  At the next session, on June 14, 2006, the therapist noted that Provencio appeared relaxed and smiled several times.  She reported that she had been walking regularly.  She also stated that she had been to court and was told

9

she may have to spend up to a year in jail, so she then went home and cried heavily.  "But then I realized this is not doing me any good," she continued, so she engaged in some other activities. Provencio also told the therapist that she continued to experience stress related to her verbally abusive sons, but she was "working on improving her outlooks on situations in her life, which she is finding to be beneficial." [Tr. 407].  On June 16, 2006, she was assessed as having depression, without psychosis. [Tr. 434].

On June 28, 2006, the therapist noted that Provencio cried at various times during the session, but at other times smiled and appeared relaxed.  Provencio described verbal abuse by her live-in boyfriend, but also stated that when she feels overwhelmed or highly stressed at home, she goes for a walk which "is highly beneficial to her." However, she remained depressed, and episodes of anxiety resulted in impairments in her ability to concentrate during the day. [Tr. 405-406].

At a session on July 11, 2006, the therapist noted that Provencio cried at times but also laughed at times during the session.  She reported that she was leaving her abusive boyfriend and verbally abusive sons and was going to stay with a female friend.  Although she reported a recent bout of depression during which she stayed in bed, slept and did not shower, she also "realized I had to get myself out of it." [Tr. 402].  The sleepiness may have been caused by medication, as her medications were adjusted on July 14, 2006, because she "could not function on Zoloft" and "just wanted to sleep all the time." [Tr. 433].

Throughout the rest of 2006, Provencio continued the one-on-one sessions.  She continued to report bouts of crying, depression and worry about her financial situation.  However, during this period she also appeared relaxed and smiling and even laughing at times during sessions, reported applying for work and actually taking on new jobs which she enjoyed, setting boundaries with her sons, improving the relationship with her boyfriend, and feeling good about the decisions she was making.  [Tr. 369, 371, 374, 380, 382, 389, 393, 395, 400-401].  She also missed several appointments during this period, for various reasons, and failed to show up for others. [Tr. 367, 368, 379, 384, 392, 397, 398, 399, 404, 424, 426, 430, 431].

10

In a Function Report which she filled out in December 2006, Provencio reported that, when the pain allowed, she could clean the house, go to the store about three times a week, prepare meals, go to appointments, and that she was able to pay bills and handle her own bank accounts. [Tr. 156-162].

Provencio continued to be treated at BAMH in 2007.  She called to cancel the first three appointments in January 2007, once with back pain, once because of the "stomach flu," and once because she overslept. [Tr. 703, 704, 705].  At a session on January 18, 2007, she reported increased depression due to her physical problems, primarily back pain. [Tr. 701].  On January 23, the therapist reported that Provencio appeared relaxed and smiled at times, and reported that she had a job interview that afternoon.  She still felt depressed due to her overwhelming financial concerns and reported increased anxiety and nightmares, as well as continuing conflicts with her sons. However, she also expressed optimism about the future and stated that she was dealing with the issues with her sons in a healthier manner. [Tr. 699].

At a session on February 6, 2007, Provencio reported increasing levels of worry due to her probation officer's telling her she would need to supply proof of employment, and she was afraid she would lose her job if she made that request of her employer. [Tr. 694].  Later in February, Provencio was switched to a new counselor.  She was a no-show for the first appointment and then canceled the second appointment due to a work conflict. [Tr. 690, 691-693].

Provencio continued with the new therapist throughout 2007.  She continued to experience depression and anxiety during this period.  On April 13, 2007, she told the therapist she lost her job without any notice, which was causing her anxiety.   [Tr. 679].  On April 23, 2007, Provencio reported that she had two leads on new jobs and had begun attending group therapy sessions, which she was finding helpful. [Tr. 672].  On May 9, 2007, she said she decided to turn her son over to his father, so that he would not be so affected by her moods.  She reported feeling better about having made progress with her health, although she was still experiencing depression, anxiety and fatigue. [Tr. 650].  On May 22 and May 25, 2007, she reported to different therapists that her depression and

11

anxiety were related to her inability to pay her bills. [Tr. 661, 663].

Her individual and group treatment sessions continued in the same vein throughout 2007. In June 2007, she missed four appointments with her therapist; she simply didn't show up and made no attempt to call in advance. [Tr. 649, 653, 654, 660].   In July 2007, she reported fatigue and difficulty concentrating.   In August 2007, she told her individual therapist and group that her depression remained about the same.  [Tr. 631, 645].  In September 2007, she reported nightmares, difficulty sleeping, intrusive thought of past incidents of sexual molestation, and continued depression related to her financial problems and back pain.  [Tr. 622, 624].

On November 2, 2007, Provencio's psychiatrist, Dr. Berkowitz, noted that she had suffered "catastrophic financial reverses in the last month," and since then had become highly anxious, with auditory and olfactory hallucinations which the doctor characterized as flashbacks to the sexual abuse experiences. [Tr. 599].  The doctor adjusted her medications, and by November 9, 2007, Provencio reported that all of the symptoms were gone.  She said she was sleeping well and functioning well. [Tr. 597].  On December 17, 2007, she reported to the group therapy session that she was doing a little better than usual, although she was still suffering from symptoms of depression and abandonment. [Tr. 571].

Medical records from BAMH continue from January to September 2008.  Provencio's therapists noted that she continued to experience depression and anxiety.  [Tr. 556, 568].  In August 2008, her therapist assessed her for bipolar disorder and found that she met the criteria.  [Tr. 923]. However, there were also positive indications in the mental health notes for this period.  The depression group, in particular, seems to have been a positive influence; the group therapist noted in February 2008 that each group member, presumably including Provencio, reported feeling better after the group sessions. [Tr. 556].  In April 2008, Dr. Berkowitz noted that although Provencio's mood was still depressed and her judgment and insight still limited, she was "reacting normally" to her father's final illness.  [Tr. 548].

On July 31, 2008, Provencio discussed with her therapist the serious health problems of her

father and said she was not "triggered to use" (presumably drugs or alcohol), because "I know I have to be good. I have to be there." [Tr. 939]. On August 28, 2008, Provencio told her therapist that she "felt triggered to use a few days ago," but she managed to resist the urge by using 12-step skills taught to her by the therapist, and using her support system by calling her sister. [Tr. 923]. In September, Provencio reported to the depression group that she had to lose 100 pounds before doctors would do surgery to correct a hernia; the group then discussed several diets and how to set goals that could easily be achieved. In later group sessions that month, she reported in on her quest to lose the 100 pounds and received positive encouragement from the group. [Tr. 914-915, 917, 919-920].

Again, numerous appointments in 2008 were canceled or postponed, some due to conflicts in the therapists' schedule, but most because Provencio canceled or failed to show up. [Tr. 545, 546, 547, 550, 552, 554, 558, 559, 560, 922, 938,

These records of Provencio's mental health treatment in 2006-2008 indicate that she was suffering from depression, anxiety and PTSD. There was also a mention of bipolar disorder at one point. These conditions were connected to a history of sexual abuse, physical pain, and situational difficulties including problems with family relationships and financial worries. However, nothing in these records would support a finding that Provencio's mental impairments prevent her from working at unskilled tasks.

During this period, in spite of the psychological problems she was working to overcome, she was able to apply coping mechanisms, deal more assertively in her relationships with her sons and boyfriend, make contributions to the group therapy sessions, take responsibility for her ailing father, resist temptations to use drugs or alcohol, and continue to do household chores, prepare meals and make regular trips to the grocery store. Although she experienced financial difficulties, she reported no problems in handling her money or managing bank accounts. While there are there are continual indications that Provencio's judgment and insight were mildly impaired, there is nothing to indicate she could not respond to simple instructions and carry out uncomplicated tasks.

The Court finds that the ALJ's application of the Grids as conclusive is in keeping with the directive of SSR 96-9p which, as noted above, provides that a moderate loss of ability to perform any of the basic work activities "may or may not significantly erode the unskilled sedentary occupational base."  The ALJ is directed to assess the individual's remaining capacities and make a judgment as to their effects her ability to perform unskilled sedentary work.  The ruling makes clear that it is not essential that a VE be consulted when "less than substantial" loss of abilities are found, and the Court finds no error in the ALJ's conclusive application of the Grids in this case.

As noted above, the record supports the ALJ's finding that Provencio's mental health impairments, while severe, do not substantially erode her ability to perform the full range of sedentary, unskilled work.  In addition, the cases cited by Plaintiff in support of her argument are distinguishable.  Wiederholt v. Barnhart, 121 Fed. Appx. 833 (10th Cir. 2005) is an unpublished case involving an ALJ who failed to include certain established limitations in his hypothetical question to the VE; these limitations included moderate difficulty maintaining concentration, persistence and pace.  In the present case, the ALJ did not find it necessary to use a VE, since he found that Provencio's limitations did not substantially erode the occupational base by interfering with her ability to perform the functions of unskilled sedentary work.  The Court has already found no error in this determination.

Nor is Craft v. Astrue, 539 F.3d 668, 677 (7th Cir. 2008) persuasive.  The Seventh Circuit in that case noted that "the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job."  The ALJ in Craft "ostensibly accounted for Craft's mental impairments by limiting him to simple, unskilled work."  Id., at 677.  In contrast, the ALJ in this case specifically found that Provencio suffers from certain mental limitations but that, in spite of those limitations, she retains the mental focus and ability to effectively perform simple, repetitive and routine work tasks such as those inherent in unskilled types of work.  This finding is supported by the record, and there is no error in this analysis.

2.  "Occasional" Postural Limitations

14

Provencio also argues that the ALJ should not have relied exclusively on the Grids in light of his finding that she was limited to "'occasional' postural activities," as this is another nonexertional limitation which reduces her ability to perform the full range of sedentary work and should have been included in a hypothetical question posed to a VE at the hearing.

"Sedentary" work is defined in the regulations as follows:

> [a capacity for] lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. §§ 404.1567(a), 416.967(a).

The ALJ found:

> A conservative evaluation of the evidence does not serve to reduce Ms. Provencio's physical capacity to a level less than that required for the performance of "sedentary" work.  She retains the ability to lift five pounds frequently and ten pounds occasionally; to sit six cumulative hours per workday; stand and walk two cumulative hours per workday; push/pull with her upper and lower extremities within the strength limitations cited; perform "occasional" postural activities; and has no manipulative, visual; communicative; or environmental limitations.

[Tr. 13].

As Provencio points out, it is difficult to discern what the ALJ's reference to "'occasional' postural activities" means; he doesn't mention any particular postures that she can or cannot perform.  "Postural" activities include climbing, balancing, stooping, kneeling, crouching and crawling. SSR 85-15, 1985 WL 56857, at **6-7.  Limitations in any of these activities may, or may not, erode the occupational base.  Id..  It is up to the ALJ to determine whether and to what extent a postural limitation affects a claimant's ability to perform all jobs within a particular category.

In this case, the ALJ determined that Provencio's ability to perform "'occasional' postural activities" did not restrict her ability to perform the necessary functions of sedentary work.   The Commissioner argues that the ALJ's statement as to postural activities was not in the nature of an

additional nonexertional limitation which would preclude conclusive reliance on the Grids, but rather consisted of a finding that Provencio did not have any postural limitations other than those inherent in sedentary work, as evidenced by the ALJ's specific finding that Provencio could perform the full range of unskilled sedentary work. This is a reasonable interpretation of the ALJ's language, particularly in light of the ALJ's credibility finding, as discussed below.

B. Handling of Treating Physician Opinion

Provencio next contends that the ALJ erred by failing to give controlling weight to the opinion of Dr. Alan Berkowitz, Provencio's treating psychiatrist.

Social Security regulations require the ALJ to "[g]enerally . . . give more weight to opinions from your treating sources." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). The ALJ may give controlling weight to the treating doctor's opinion on issues relating to the nature and severity of the impairments, if that opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record." Id..

The ALJ is not required to give the opinion controlling weight, however. If he does not, he should "give good reasons" in his decision for the lesser weight he assigns to the treating source's opinion, SSR 96-2p, supra, at * 5 and, "[f]urther, the notice of determination or decision 'must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" Watkins v. Barnhart, 350 F.3d 1297, 1300 (10th Cir. 2003).

> An ALJ should keep in mind that "[i]t is error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record."

Id., citing SSR 96-2p, supra, at *2; 20 C.F.R. § 404.1527(d)(2).

If the ALJ determines that a treating source opinion should not be accorded controlling weight, that does not mean the opinion should be rejected; it is still entitled to deference and must

be weighed using the factors set forth in the regulations at 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2). Those factors include: whether the source actually examined the claimant; whether the source treated the claimant; the length, nature and extent of the treatment relationship; the extent to which the medical source presents relevant evidence to support his opinion; how consistent the opinion is with the record as a whole; whether the medical source is a specialist; and other factors.

This scheme contemplates that the ALJ will weigh the treating source's opinion against all of the record evidence to determine whether the opinion should be accepted as conclusive. In this case, the ALJ followed that directive, and he adequately explained his reasons for rejecting Dr. Berkowitz's conclusions.

The May 2007 letter from Dr. Berkowitz to Whom It May Concern reads, in its entirety:

> Teresa Provencio is being treated for chronic depression, because of this illness, and her back problems, she cannot work. Her catastrophic financial state is making depression worse. If you have any questions or concerns concerning this matter please feel free to contact me at 388-4412.

[Tr. 477].

The November 2008 letter from Dr. Berkowitz, again to Whom It May Concern, reads in its entirety:

> This letter is to inform that Teresa Provencio is being treated for Bipolar II disorder. The frequent mood episodes prevent her from working. If you have any further question or need further information please feel free to contact or [sic] office at 575-388-4412.

The ALJ did not ignore or completely discount Dr. Berkowitz's letters. Rather, he acknowledged the doctor's opinion that Provencio could not work [Tr. 12-13] but went on to conclude:

> Dr. Berkowitz's submissions are more focused on Ms. Provencio's financial situation. The opinions expressed in [the above-noted letters] do not address the question of the functional limitation, if any, which the claimant's condition imposes on her and are quite conclusory, providing very little explanation of the evidence relied upon in forming his vocational opinion, an area which is outside his area of expertise.

[Tr. 14].

While the second letter by Dr. Berkowitz makes a brief reference to "mood episodes," there is very little in either letter which "presents relevant evidence to support his opinion," as required by the regulations.  In addition, the ALJ is required to test a medical opinion, even one by a treating physician, to determine whether it is supported by the record as a whole.  20 C.F.R. §§ 404.1527 and 416.927.  In this case, the ALJ concluded:

> When Ms. Provencio's mental status is evaluated under sections 12.04 and 12.06 of the regulations, I find no more than "mild" limitations in her activities of daily living and social functioning. Ms. Provencio retains the mental wherewithal to engage in a wide range of normal activities independently, appropriately and effectively, and there is no evidence of significant problems interacting with others . . . . I conclude that Ms. Provencio may be subject to some symptoms which would interfere with her ability to follow complex instructions and perform job tasks . . . [but she nevertheless] retains the mental focus and ability to effectively perform simple, repetitive and routine work tasks such as those inherent in unskilled types of work.

[Id.].

Thus, it is apparent that the ALJ rejected Dr. Berkowitz's opinion that Provencio was incapable of working, because he found that opinion conclusory and without record support.  The Court upholds this finding.

The records submitted by Provencio indicate that she saw Dr. Berkowitz on several occasions between October 2006 to April 2008.  At their first session on October 13, 2006, he noted Provencio's history of non-psychotic depressions and PMS (pre-menstrual syndrome).  He also noted her history of sexual abuse and the fact that she still exhibits some symptoms of PTSD.  He described her reactions to various depression medications and stated that, aside from symptoms of irritability, anger and aggression caused by Wellbutrin, there was no other evidence of bipolar disorder at that time.  His assessment was that Provencio had typical symptoms of depression, exacerbated in the premenstrual period and made worse by Wellbutrin.  He found no psychotic symptoms. [Tr. 428].

On November 14, 2006, Dr. Berkowitz wrote that the medication Lexapro worked extremely

well for Provencio's symptoms of depression, but it was much too sedating.  He adjusted her medications, switching her to Cymbalta. [Tr. 425].  The next recorded appointment with Dr. Berkowitz was January 29, 2007.  He noted that Provencio was too sedated on the Cymbalta also, and he prescribed Effexor. [Tr. 697-698].  On March 12, 2007, he reported that Provencio's mood had improved somewhat and that in spite of a recent anniversary of a cousin's death and flashbacks to incidents of abuse, he noted that her "[i]mprovement in depression is modest but definitely present."  [Tr. 688].

On May22, 2007, Dr. Berkowitz wrote that the increase in Effexor was effective and the medication "took away her depressive symptoms."  However, he wrote, "she pulled out her back again – has disc problems – has been unable to work, has gotten much more depressed, and is in a lot of pain."  He concluded that "[h]er current mood has a lot do with not being able to pay any of her bill[s], having to borrow money [fo]r essentials like food."  [Tr. 663].  It was on this date that Dr. Berkowitz wrote his first letter To Whom It May Concern, stating Provencio was being treated for depression and because of this, and her back problems, she could not work; he added that her catastrophic financial state was making her depression worse. [Tr. 477].

The next recorded appointment with Dr. Berkowitz was on September 18, 2007.  He noted that Provencio was still depressed, that her back pain was worse, and that her financial problems were "only slightly better." [Tr. 622].  On November 2, 2007, Dr. Berkowitz noted that Provencio "has had catastrophic financial reverses in the last month, and since then has become highly anxious, hearing voices calling her name and having olfactory hallucinations which are actually flashbacks to abuse experiences."  He prescribed Risperdal (an antipsychotic medication) and told her to return in one week.  [Tr. 599-600].  At the follow-up appointment on November 9, 2007, he noted that the medication had been successful, that all her previous symptoms were gone, and that she was sleeping well and functioning well.  [Tr. 597].

Provencio saw Dr. Berkowitz again on April 14, 2008.  He noted that she remained depressed and was "very sad and upset" over her father's impending death, but was "reacting

normally." [Tr. 548].  This appears to be the final visit with Dr. Berkowitz in these records.  On November 4, 2008, he wrote his second letter To Whom It May Concern, in which he noted that Provencio was being treated for bipolar disorder and that her "frequent mood episodes" prevented her from working. [Tr. 954].

During the period recorded, several appointments with Dr. Berkowitz were canceled, most of them by Provencio. [Tr.  545, 552, 554, 559, 669].

The Court finds no error in the ALJ's handling of Dr. Berkowitz's opinion letters.  Provencio criticizes the ALJ's finding that Dr. Berkowitz often focused on Provencio's financial problems as a cause of her depression and anxiety; however, this comment is not inaccurate, as Dr. Berkowitz mentions financial issues several times in his session notes.  [*See, e.g.*, Tr. 477, 599, 622, 663].

In addition, the two letters set forth above offer an opinion on a non-medical issue which is exclusively reserved to the Commissioner.  Cowan v. Astrue, 552 F.3d 1182, 1189 (10th Cir. 2008); 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1).  In Cowan, the treating physician stated at one point that he felt the claimant could never return to work, and at another that he didn't know whether the claimant would be able to return to work.  Noting that the ultimate issue of ability to work is one reserved to the Commissioner, the Tenth Circuit held, "Dr. Gietzen's brief statement on the medical form was not a true medical opinion. It did not contain Dr. Gietzen's judgment about the nature and severity of Mr. Cowan's physical limitations, or any information about what activities Mr. Cowan could still perform."  Id., at 1189.

The same is true of Dr. Berkowitz's statements that Provencio cannot return to work.  There was no error in the ALJ's determination that the statements expressed in the two letters were not entitled to controlling weight.

C.  Credibility Determination

Provencio also finds fault with the ALJ's credibility determination, arguing that it is not supported by the evidence.

"Credibility determinations are peculiarly the province of the finder of fact, and we will not

upset such determinations when supported by substantial evidence." <u>Diaz v. Sec'y of Health &</u> <u>Human Servs.</u>, 898 F.2d 774, 777 (10th Cir. 1990).  *See also*, <u>Casas v. Sec'y of Health & Human</u> <u>Servs.</u>, 933 F.2d 799, 801 (10th Cir. 1991) (the Court should "defer to the ALJ as the trier of fact, the individual optimally positioned to observe and assess witness credibility").  Although credibility findings must be closely and affirmatively linked to substantial evidence and not merely conclusions in the guise of findings, <u>Houston v. Bowen</u>, 838 F.2d 1125, 1133 (10th Cir. 1988), a "formalistic factor-by-factor recitation" is unnecessary, as long as the Commissioner provides examples of specific evidence upon which he relies to support his credibility findings.  <u>Qualls v. Apfel</u>, 206 F.3d 1368, 1372 (10th Cir. 2000).

With respect to allegations of pain, a claimant's subjective statements are insufficient to establish disability.  <u>Talley v. Sullivan</u>, 908 F.2d 585, 587 (10th Cir. 1990).  Rather, the claimant must first prove by objective medical evidence the existence of a pain-producing impairment which could reasonably be expected to produce the alleged disabling pain.  Next, the ALJ must determine whether there is a loose nexus between the proven impairment and the claimant's subjective allegations of pain and, if so, the ALJ must next determine whether, considering all the evidence both objective and subjective, claimant's pain is in fact disabling.  .  <u>Thompson v. Sullivan</u>, 987 F.2d 1482, 1488 (10th Cir. 1993);  <u>Luna v. Bowen</u>, 834 F.2d 161, 163-66 (10th Cir. 1987).

The Court finds sufficient evidence on the record to support the ALJ's finding that Provencio is not entirely credible.  Assuming that Provencio established the first two prongs of the <u>Luna v.</u> <u>Bowen</u> test – *i.e.*, that objective medical evidence establishes the pain-producing impairment of spine and disc problems, and that there is at least a loose nexus between these impairments and Provencio's subjective allegations of pain – there is nevertheless sufficient evidence on the record to support the finding that Provencio's complaints of disabling pain are not entirely credible.

The ALJ noted that Provencio alleges persistent back pain, but that an MRI taken in April 2006 showed only slight disc bulging at three lumbar levels, with no stenosis.  The ALJ further noted that the treatment she received has been conservative, consisting of epidural injections,

physical therapy and medication, and that she was walking for exercise on a regular basis as of July 2006. He noted also that her morbid obesity was thought to contribute to her back pain in July 2007; however, in spite of this, her muscle strength was found to be normal, her reflexes intact, and her straight leg raises negative. [Tr. 12]. These findings are supported by the record. [Tr. 257, 283-289, 297-303, 407-408, 438, 439, 440, 441, 446, 480-483, 496, 497, 520, 528, 530, 533-534, 805-809, 828-832, 836-840, 841-845, 848-853, 853-857, 879-880, 888-892, 893-897, 898-901, 902-907, 907-911, 942, 946].

The ALJ also noted that Provencio stated that she stopped working in November 2005 because her back was "locking up," and that she never returned to any type of job after that time. However, the record indicates that she was fired from her job in November 2005 amid allegations of theft, or perhaps because she broke a planter; in any event, it was not due to physical or mental disability. The record further shows that Provencio engaged in paid work after November 2005.

When questioned about entries in the medical records made after the alleged onset date which indicated that she missed medical appointments because of her job, she stated that the "work" referred to was unpaid work caring for her ailing father. However, the numerous references in the record to her job, to job applications and interviews, and to her work as a babysitter and a caregiver to two elderly women [Tr. 379, 380, 382, 384, 389, 393, 395, 399, 400, 405, 431, 432, 667, 679, 694, 699], support the finding that Provencio's credibility was not entirely reliable.

The ALJ further found:

> There is clear evidence that the claimant has misrepresented facts relevant to the issue of disability. The evidence indicates that Ms. Provencio was actually fired from her job in 2005, rather than for impairment-related reasons as she claimed. It also appears that she later collected unemployment, which is indicative of holding oneself out for work. As noted above, the record is replete with entries indicating that claimant had indeed worked after November 2005. Ms. Provencio's testimony that she lost her 2005 job due to impairment-related reasons and has not worked at any type of job since is simply not credible on the face of the record. This lack of credibility is of great significance and makes her testimony regarding the extent to which her conditions limit her highly suspect when consideration is given to her subjective complaints.

> Ms. Provencio's claim is based almost exclusively on her subjective complaints and her pain complaints in particular are deemed exaggerative. Ms. Provencio's treatment for back problems has been routine and conservative. Notwithstanding her excessive weight, the level of impairment is far in excess of the objective findings, examination findings, and her treatment history.

[Tr. 13] (internal citations to exhibits omitted).

With respect to Provencio's claim of disabling mental impairments, the ALJ noted that these impairments were present at approximate the same level of severity throughout the period under consideration, and the fact that they did not prevent her from working during that time "strongly suggests that they would not currently prevent work." [Tr. 13].

The Court finds no legal or factual error in the ALJ's credibility assessment. Provencio argues that her mental impairments affect her judgment, which would excuse any exaggeration or even outright lies. [Doc. 20, at 15]. While there are numerous references in the mental health treatment records that Provencio's insight and judgment are "limited," there is no indication in any of the mental health records to support the notion that her psychological impairments cause her to bend or distort the truth.

Provencio also points to cases holding that the ability to work sporadically does not prove the absence of a disability. Jozefowicz v. Heckler, 811 F.2d 1352 (10th Cir. 1987); Walker v. Sec'y of Health & Human Servs., 943 F.2d 1257 (10th Cir. 1991). In this case, however, the ALJ did not cite the evidence of employment as proof that Provencio was not disabled; rather, he cited it as evidence of her lack of credibility, given her statement that she had not worked since November 2005 and her assertion that any work she did related solely to caring for her ailing father and was unpaid. The ALJ noted references to a babysitting job and a job caring for two elderly women, and pointed to instances in which Provence's work appeared to be paid work, as she stated that the work enabled her to pay bills. [Tr. 12].

Thus, it was not the fact that she worked, but that she lied about not having worked for pay, which caused the ALJ to question her overall credibility. This was not error. As was true in Martz v. Astrue, No. 1:07-CV-00219, 2008 WL 975051, at *5 (N.D. Ind. Apr. 8, 2008), the ALJ here

"properly considered as a factor in his credibility analysis that in the three years following her alleged onset date, Martz's daily activities included performing some work; yet, he did not improperly equate this evidence with an ability to work full-time."  It is proper to consider a claimant's daily activities in determining whether her statements of disabling pain are credible.  20 C.F.R. §§ 404.1529(c)(3)(I); 416.929(c)(3)(I).  In the present case, the ALJ did not rely for his credibility finding solely on the fact that Provencio worked for pay when she denied having done so, but he considered other factors as well.  There is ample support in the record for his credibility finding.

Provencio further criticizes the ALJ's reliance on her application for unemployment benefits which, he said, "is indicative of holding oneself out for work." [Tr. 13].  Provencio cites Kinsella v. Schweiker, 708 F.2d 1058, 1066 (6th Cir. 1983) and other cases to support the argument that this was improper.  However, Kinsella was based on the ALJ's reliance on an application for unemployment benefits as the sole basis for the credibility finding; in the present case, the ALJ relied on other evidence as well which, as noted above, supports the finding that Provence is not entirely credible.

D.  ALJ's Treatment of Evidence of Noncompliance with Medical Advice

Provence next contends that the ALJ erred in making the following finding:

> [T]he numerous instances in which [Provence] failed to attend scheduled meetings with her mental health provider suggests that her condition was not as serious as she contends.  The claimant cancelled or failed to show up for appointments with her mental health provider at least seven times due to work conflicts.  In addition, she was listed as a "no show" with her mental health provider seventeen times between September 2006 and August 2008.  Additional missed appointments for various reasons are also reflected in the record.

[Tr. 13-14] (internal citations to exhibits omitted).

Provence argues that it was error to rely on the fact that she missed numerous appointments as evidence that her mental condition was not as serious as claimed,  in that she offered valid reasons "for at least a dozen of the missed appointment, such as illness or fatigue," and because the ALJ failed to consider that noncompliance may be a symptom of depression.  [Doc. 20, at 16].  Provence

cites <u>Pate-Fires v. Astrue</u>, 564 F.3d 935 (8th Cir. 2009) for the proposition that mental illness may be the cause of noncompliance.  However, in that case, there was overwhelming evidence that the claimant's noncompliance was caused by her mental illness, described as follows:

> Due to her mental illness, Pate-Fires has "extremely poor insight resulting in poor medication compliance;" she is "potentially dangerous to others;" "[h]er stress tolerance is quite low;" "[h]er ability to stay focused with even minor tasks is impaired;" and "[h]er ability to interact with supervisors and to follow instructions is impaired."

<u>Id.</u>, at 944-45.  The court in <u>Pate-Fires</u> went to state that the test courts have applied is whether the claimant's psychological and emotional difficulties deprive her of "the rationality to decide whether to continue treatment or medication." <u>Id.</u>, at 945-46.  Provence points to no such evidence in this case.

In addition, while Provence may have offered reasons for many of the missed appointments, there were more than a dozen occasions when she simply did not show up, with no explanation whatsoever.

The ALJ did not rely solely on Provencio's missed appointments for his conclusion that her complaints of a disabling mental condition were not wholly credible; for example, he noted in connection with the credibility finding that her depression and mental impairments did not prevent her from working at times during the applicable period, which suggested that these impairments would not currently prevent her from working.

The ALJ did not ignore Provencio's mental impairments.  Indeed, he found that her major depression, PTSD, bipolar disorder and adjustment disorders constituted "severe" impairments [Tr. 10], and he conducted the appropriate mental function analysis. [Tr. 11].  What he found was that, in spite of the existence of mental impairments, Provencio's claims of disabling mental conditions were not entirely credible, and he cited to record evidence in support of this finding.  The Court perceives no error in the ALJ's noncompliance analysis.

E.  <u>Substance Use Analysis</u>

Finally, Provencio contends that the ALJ did not perform a proper substance use analysis.

She notes that the ALJ stated, in the last finding of his decision, that although Provencio is not disabled, "there is evidence of substance use disorder." [Tr. 15].  It is unclear why the ALJ added this statement to his opinion.  As Provencio points out, the ALJ must first determine that a claimant is disabled prior to considering whether drug or alcohol abuse is a material factor in the disability. Drapeau v. Massanari, 255 F.3d 1211, 1214 (10th Cir. 2001).

In this case, the ALJ did not make a finding as to materiality of any substance abuse problem; indeed, that would have been improper as he found that Provencio is not disabled.  Perhaps it would have been preferable if the ALJ had not included this statement in the decision, as it appears to be irrelevant to the issues.  However, the fact that he did so has no impact on the analysis and does not provide grounds for reversing the decision.

## Order

IT IS THEREFORE ORDERED that Plaintiff's Motion to Reverse and Remand for a Rehearing [Doc. 20] is denied, and this action is dismissed with prejudice.

_Lorenzo F. Garcia_
Lorenzo F. Garcia
United States Magistrate Judge